# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES J. HAYES, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| | ) **CIVIL ACTION NO. 08-3653** |
| Plaintiff, | ) ) |
| vs. | ) CLASS ACTION COMPLAINT |
| | ) |
| HARMONY GOLD MINING COMPANY LIMITED, BERNARD SWANEPOEL and NOMFUNDO QANGULE, | ) ) **JURY TRIAL DEMANDED** ) |
| | ) |
| Defendants. | ) ) ) |

Plaintiff, James J. Hayes ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Harmony Gold Mining Company Limited ("Harmony Gold" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of Harmony Gold's American Depository Receipts ("ADRs" or "shares") and call options, and sellers of Harmony Gold's put

options, between April 2, 2007 and August 7, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Harmony Gold is a gold producer that operates 22 individual mines and projects across the world.  Harmony Gold produced 2.3 million ounces of gold during fiscal year 2007 (ended June 30, 2007).  At the end of fiscal year 2007, the Company's ore reserves amounted to 53.6 million ounces of gold.  The Company reports its financial and operational results in divisions, which are segmented into groups by Country of location, and which are further divided into four categories: quality assets, growth projects, leveraged assets and surface operations.  Mines in the Company's South African operations division include the Tshepong, Bambanani and Joel mines.  Mines among the Company's Australian operations division include the Mt. Magnet and South Kal mines.

3.     Harmony Gold reports its financial and operational results on a fiscal year ending on June 30th.  The Class Period begins on April 2, 2007, the first trading day of Harmony Gold's fiscal fourth quarter 2007.  On April 25, 2007, Harmony Gold reported strong financial and operational results for its third quarter 2007 (ended March 31, 2007).  For the quarter, the Company reported that its headline earnings improved 31.8 percent to 58 SA cents per share, that its total operating profit rose 15.1 percent, and that its quarterly net profit increased 6.5 percent. Additionally, the Company stated that its total cash operating costs "were marginally down," and that its South African underground operations "showed strong cost containment" with a 2.1 percent cost reduction.

4.     On May 2, 2007, the Company reaffirmed its financial and operational results announced on April 25, 2007, and stated that its third quarter "was marked by a steady operational performance with sound cost control."  Additionally, the Company reported that two

2

of its South African mines, Tshepong and Bambanani, had experienced underground fires, which resulted in a drop in production at those locations. Production at another South African mine, Joel, was significantly impacted by the Company's decision to do "major re-engineering work" on a shaft. Despite these events, the Company reported that its costs were "well contained throughout the [South African] Group." The Company also announced that it had launched a "significant" drill program at Mt. Magnet, one of its Australian sites, though it failed to disclose the full financial impact that was associated with this program.

5.     On August 6, 2007, Harmony Gold reported preliminary financial and operational results for its fourth quarter and fiscal year 2007 (ended June 30, 2007). The Company warned that its financial results for the quarter were "expected to differ significantly from those of the three previous quarters as well as from the analysts' consensus." For the fourth quarter, the Company stated that it expected to report a headline loss of between 130 and 160 SA cents per share, compared with a headline profit of 58 SA cents per share for the third quarter. This quarterly loss was primarily the result of the Company recording significantly higher costs for the quarter, and included a 25 to 28 percent increase in the Company's total cash operating costs as a result of "the newly installed accounting software system that resulted in some of the March quarter's costs being captured in the June 2007 quarter." Thus, the Company had substantially understated its costs in previous quarters and was forced to take substantial charges in the fourth quarter to remedy such underreported costs. Additionally, the Company reported that its cost base had increased by 8 to 12 percent from the previous six months. Finally, the Company announced that its Chief Executive Officer ("CEO") had resigned, "with immediate effect."

6.     On this news, the Company's shares fell $2.45 per share, or over 18 percent, to close on August 6, 2007 at $11.02 per share, on unusually heavy trading volume. The following

day, the Company's shares declined an additional $1.57 per share, or over 14 percent, to close on August 7, 2007 at $9.45 per share, again on heavy trading volume.  This closing price on August 7, 2007 represented a two-day decline in the Company's shares of $4.02 per share, or 29.8 percent, and a cumulative decline of $7.25 per share, or over 43.4 percent, from the value of the Company's shares at their Class Period high of $16.70 on April 25, 2007.

7.      Throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects.  Specifically, defendants failed to disclose or indicate the following:  (1) that the Company's costs had significantly increased throughout 2007; (2) that the Company had underreported these increased costs in its previously issued financial statements; (3) that the Company had experienced a significant decrease in gold production for the third quarter 2007 due to production problems at various sites, which had already materialized at the time its Class Period statements were made; (4) that the Company had failed to disclose the full impact that these production problems would have on the Company's financial and operational results; (5) that, as a result of the Company's understatement of its costs and its lower production for the quarter, the Company had understated its operating costs and overstated its net profit for the third quarter; (6) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times; (7) that the Company would be forced to take substantial charges in the fourth quarter 2007 to remedy such failures, causing the Company to report a net loss for the quarter; (8) that the Company lacked adequate internal and financial controls; and (9) that, as a result of the above, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

8.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADRs, call options and put options, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Harmony Gold's ADRs actively trade on the New York Stock Exchange in this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, James J. Hayes, as set forth in the accompanying certification, incorporated by reference herein, purchased Harmony Gold ADRs at artificially inflated prices, and sold Harmony Gold put options at artificially deflated prices, during the Class Period and has been damaged thereby.

14.     Defendant Harmony Gold's principal executive offices are located at Suite No. 1, Private Bag X1, Melrose Arch, South Africa.

15.     Defendant Bernard Swanepoel ("Swanepoel") was, at all relevant times, the Company's CEO.

16.     Defendant Nomfundo Qangule ("Qangule") was, at all relevant times, the Company's Financial Director.

17.     Defendants Swanepoel and Qangule are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Harmony Gold's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Harmony Gold is a gold producer that operates 22 individual mines and projects across the world.   Harmony Gold produced 2.3 million ounces of gold during fiscal year 2007 (ended June 30, 2007).   At the end of fiscal year 2007, the Company's ore reserves amounted to 53.6 million ounces of gold.   The Company reports its financial and operational results in

divisions, which are segmented into groups by Country of location, and which are further divided into four categories: quality assets, growth projects, leveraged assets and surface operations.  Mines in the Company's South African operations division include the Tshepong, Bambanani and Joel mines.  Mines among the Company's Australian operations division include the Mt. Magnet and South Kal mines.

### Materially False and Misleading
### Statements Issued During the Class Period

19.    The Class Period begins on April 2, 2007, the first trading day of Harmony Gold's fiscal fourth quarter 2007.  On April 25, 2007, the Company issued a press release entitled "Harmony Financial Results for the Quarter Ending March 2007."  Therein, the Company, in relevant part, stated:

> Harmony Gold Mining Company Ltd (NYSE/NASDAQ: HMY; JSE: HAR) today announced *headline earnings improved by 31.8% to 58 cents per share compared with 44 cents per share for the December 2006 quarter and a 48 cents per share loss for the March 2006 quarter*.
>
> *US$ headline earnings improved by 33.3%* from 6 cents per share to 8 cents per share during the March 2007 quarter.
>
> *Total operating profit rose 15.1%* to R869 million (R755 million) quarter on quarter and is up by 184.0% from R306 million compared with the corresponding period ended March 2006.
>
> *The March 2007 net profit was up 6.5% to R247 million compared with the December 2006 quarter* considering that the December 2006 had an accounting profit of R236 million which arose from the conversion of Western Areas shares to Gold Fields shares. A loss of R174 million was reported for March 2006.
>
> Fewer total tonnes were milled for the quarter under review. The 6.2% drop in tonnes — from the SA underground operations — to 3 152 000 tonnes compares with 3 361 000 tonnes previously. This was partially countered by the 4.2% higher grades of 5.0g/t from the SA underground operations, which resulted in gold production being only 2.5% lower at 15 655kg (16 066kg). A higher Rand

gold price received of R151 833/kg and good cost control translated into a pleasing cash operating profit of R868.5 million, an increase of 15.1% quarter on quarter.

***Total cash operating costs were marginally down*** at R103 608/kg from R104 132/kg previously. ***The SA underground operations showed strong cost containment with a 2.1% cost reduction to R101 868/kg (R104 056/kg), despite volumes being negatively effected by the end of the year holidays.***

The Australian operations reported a decrease in gold production from 60 707oz in the December quarter to 51 697oz. This is ascribed to mining of lower grade at Mt Magnet's Hesperus Open Pit and from South Kal Mines underground due to temporary ground control issues. [Emphasis added.]

20.    On May 2, 2007, the Company filed a 6-K Report with the SEC to report its financial and operational results for the third quarter 2007.   In affirming its previously announced results for the quarter, the Company, in relevant part, stated:

March is usually the month when we at Harmony come together at our leadership conference to realign our leaders to the strategic direction for the company. The objective of these conferences is to spend time together as the company's leaders and recommit to our values, which include making value creation a Harmony way of life.

Harmony continues to invest large sums of money on training and developing our employees. We have a growing pool of talented individuals who have been identified for managerial positions in line with our succession plans. I believe that currently Harmony has a strong core of managers who will unlock sustainable value for all our stakeholders. We also continue to be able to attract quality people to fill vacancies in Harmony.

Our growth projects, which are the exciting component of the organic growth within our portfolio of assets, will make our portfolio more profitable and robust. These projects are on schedule and should begin contributing to our bottom line within the 2008 financial year through to the end of 2010.

***Harmony's March quarter was marked by a steady operational performance with sound cost control. The full benefits of the higher gold price and improving flexibility through increasing development over the past 15 months are now being realized***

*when comparing the current quarter with the corresponding period for March 2006.*

*Headline earnings improved by 31.8% to 58 cents per share compared with 44 cents per share for the December 2006 quarter and a 48 cents per share loss for the March 2006 quarter.*

*Total operating profit rose 15.1% to R869 million (R755 million) quarter on quarter and is up by 184.0% from R306 million compared with the corresponding period ended March 2006.*

*The March 2007 net profit was up 6.5% to R247 million compared with the December 2006 quarter* considering that the December 2006 had an accounting profit of R236 million which arose from the conversion of Western Areas shares to Gold Fields shares. A loss of R174 million was reported for March 2006.

* * *

*Total cash operating costs were marginally down at R103 608/kg from R104 132/kg previously. The SA underground operations showed strong cost containment with a 2.1% cost reduction to R101 868/kg (R104 056/kg).*

* * *

**OPERATIONAL REVIEW**

**South African Operations**

**Tonnes Milled**

Tonnages from the SA underground operations were down by 209 000 tonnes at 3 152 000 tonnes. *Both Tshepong and Bambanani experienced underground fires resulting in a drop in tonnes during March. Joel was also adversely affected by the engineering construction underway at North Shaft.* After a poor performance in the December quarter, volumes from Masimong were steady while Target made an exceptional improvement quarter on quarter.

* * *

**Cost Control**

*Cost was well contained throughout the Group.* Cash operating costs for the SA underground operations dropped by 2.1% to R101

868/kg from R104 056/kg previously, on the back of lower tonnes milled.

\* \* \*

**Leveraged operations**

Shafts included under this section are Bambanani, Joel, West Shaft, St Helena, Harmony, Merriespruit, Unisel, Brand and Orkney. …

Leveraged operations produced 8.9% lower tonnes at 1 277 tonnes. The 6.9% improvement in recovery grades to 4.5g/t (4.2g/t) mitigated some of the negative impact of gold production. Production was 2.5% lower at 5 740kg from 5 885kg.

R/t costs were up to R500/t (R460/t), but R/kg costs increased marginally by 1.7% to R111 291/kg (R109 427/kg).

***Significant underperformance was recorded at Joel, where it was decided to do major re-engineering work on the North Shaft. This will also impact on the June 2007 quarter.*** It should be noted that 2% or 30 000 tonnes of the reduction quarter on quarter is due to the permanent closure of West shaft.

\* \* \*

**Australian Operations**

**Highlights**

■ Underground resource delineated beneath Shirl open pit

■ HBJ open pit cutback project at South Kal Mines on track for ore production in September 2007

■ 100 000oz of open pit resources delineated at South Kal Mines

■ ***Significant resource drill programme launched at Mt Magnet***

\* \* \*

**Mount Magnet**

Mt Magnet operations produced 28 014oz (35 242oz) of gold in the March quarter from milling of 412 681 tonnes at an average grade of 2.1g/t (2.4g/t).

Underground production amounted to 18 534oz (19 643oz) in the current quarter from the milling of 115 876 tonnes (110 635 tonnes) at 5.0g/t (5.5g/t).

Hill 50 continued to incur hanging-wall dilution in 21A and 20L stopes causing continued reductions in stope grades.

The underground South and North stopes were hampered by dilution and seismicity events.

***Capital expenditure of AUD4.9 million was mainly spent on open pit and underground capital mine development.***   [Emphasis added.]

21.   The statements contained in ¶¶ 19 and 20 were materially false and misleading when made because defendants failed to disclose or indicate the following:   (1) that the Company's costs had significantly increased throughout 2007; (2) that the Company had underreported these increased costs in its previously issued financial statements; (3) that the Company had experienced a significant decrease in gold production for the third quarter 2007 due to production problems at various sites, which had already materialized at the time its Class Period statements were made; (4) that the Company had failed to disclose the full impact that these production problems would have on the Company's financial and operational results; (5) that, as a result of the Company's understatement of its costs and its lower production for the quarter, the Company had understated its operating costs and overstated its net profit for the third quarter; (6) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times; (7) that the Company would be forced to take substantial charges in the fourth quarter 2007 to remedy such failures, causing the Company to report a net loss for the quarter; (8) that the Company lacked adequate internal and financial controls; and (9) that, as a result of the above, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

22.     On May 18, 2007, the Company issued a press release entitled "Close-out of Australian Hedge Book."  Therein, the Company, in relevant part, stated:

> Johannesburg, 18 May 2007. Harmony announced today that it has closed out the remainder of the Australian hedge book inherited with the acquisition of the Hill 50 mine in Western Australia. 230 000 ounces were closed out at an average spot rate of A$ 809oz, for a total cost of A $75.8 million (R 436 million).
>
> These positions had a negative marked-to-market of A$ 78.6 million (R 460.7 million) for the quarter ending 31 March 2007 at an average forward price of A$ 517.78 per ounce.

23.     In response to this news, on May 21, 2007, Deutsche Securities issued an analyst report on Harmony Gold.  The report, in relevant part, stated:

> Harmony has closed out its Australian hedge book, which has been a thorn, albeit a small one, in Harmony's side. According to the release Harmony will buy out the total hedge book of 230 000 ounces at A$809/oz (US$663/oz) for a total consideration of A$76m (or R436m).
>
> The cash cost of the close out looks well within the means of Harmony's financials. While the close out will reduce Harmony's cash on balance sheet from R985m to R522m, net debt to equity remains a relatively comfortable 14% from 12% and net debt to EBITDA (annualised March quarter) remains in-line with the SA gold sector long run average of 0.97x from 0.84x.
>
> ***In our view, Harmony is in a financial sweet spot, certainly the best position we've ever seen.*** Not only does its have the capacity on its balance sheet to maintain project and maintenance capex levels (critical if targeted grades are going to be achieved), but it also holds further firepower through its R2bn near cash investment in Gold Fields.
>
> ***In our view the close out not only illustrates the group's current financial clout but also its new found confidence (compliments of weak recent operating performances from its peers).*** While the close out is an expensive one, its [sic] confirms Harmony [sic] belief in a stronger gold price. Further it eradicates what has long been a troublesome financial obligation. ***On the softer side, earnings should be less noisy, as swings from gains and losses on financial instruments fall away.***  [Emphasis added.]

24.     On May 30, 2007, Barnard Jacobs Mellett issued its Quarterly Global Gold Review.  In upgrading Harmony Gold to "neutral," the Review, in relevant part, stated:

> March quarter costs hold above R100,000/kg, but lower than forecast. ***In a surprisingly good cost performance, despite lower tonnages, unit costs (R/t) fell 2% in the quarter. We have no idea quite how the company managed to achieve this!*** Combined with better grades, this helped Harmony report lower cash costs quarter on quarter at R103,608/kg ($445/oz).
>
> ***Cash operating profit sharply higher. With a higher gold price and lower cash costs, cash operating profit was 15% higher in the quarter at R869m ($120m).***
>
> Risky but tempting - Harmony remains horribly exposed should the gold price turn down but we recently upgraded our gold price outlook and are now more comfortable that current gold prices will be maintained. ***We also believe that the company could deliver further grade improvements next quarter (+5%) and there remains room for more.*** Additional asset sales now appear likely and we view the restructuring process positively. Finally, management has initiated projects to evaluate the uranium potential within its mine dumps and this is likely to generate a lot of positive news around the company. Countering this is the threat of production disruptions due to strikes and possible electricity supply disruptions.
>
> Favorite name in SA Golds - With Anglogold and Gold Fields unlikely to deliver much improvement on their current poor performances until next year, ***we have upgraded our recommendation on Harmony and believe it will outperform its SA peers through the remainder of the year***. However, in the global peer group, the stock appears relatively expensive and we therefore only upgrade it to Neutral.  [Emphasis added.]

25.     On June 14, 2007, Fitch Ratings announced that it had assigned the Company a BB+ rating and a "stable" outlook.  Fitch's announcement, in relevant part, stated:

> ***Fitch Ratings has today assigned South Africa-based Harmony Gold Mining Company Limited ("Harmony") an Issuer Default rating ("IDR") of 'BB+' and a Short-term IDR of 'B'. At the same time the agency has affirmed Harmony's National ratings at Long-term 'BBB(zaf)' and Short-term'F3(zaf)'. The Outlooks on both the IDR and National Long-term rating are Stable.***

13

*The assignment of an international rating is in response to Harmony's plans to launch a USD350m seven-year international bond in July 2007.* The proceeds of the bond issue will be used to fund ongoing mine development and expansion, both in South Africa and at the company's new Hidden Valley open pit mine in Papua New Guinea. This new mine is forecast to cost USD280m and is expected to have an annual production of 285,000 ounces of gold and 3.9 million ounces of silver. Ongoing expansion projects are overall expected to add 1.4 million ounces of gold to Harmony's total production by 2010.

*Harmony's ratings reflect the positive financial trend evident in the company's H107 results, and the prospect that its financial performance over the next two to three years will benefit from higher production levels and a stabilisation of operating costs.* Costs are in part expected to stabilise as a result of the Hidden Valley mine coming into production in late 2008. This operation is forecast to have significantly lower cash costs than the company's existing, mature underground operations in South Africa.

\* \* \*

*The Stable Outlook reflects Fitch's view that Harmony's future capital expenditure programme and the resultant diversification away from South Africa should improve its operational and financial profiles.* This is provided that Harmony is able to manage the associated project risks and that commodity price and exchange rate conditions remain generally favourable.  [Emphasis added.]

### The Truth Begins to Emerge

26.    On August 6, 2007, Harmony Gold issued a press release entitled "Trading Statement" to report preliminary financial and operational results for the Company's fourth quarter and fiscal year 2007 (ended June 30, 2007).  Therein, the Company, in relevant part, stated:

Harmony Gold Mining Company Limited (Harmony) announces that *its financial results for the quarter ending 30 June 2007 are expected to differ significantly from those of the three previous quarters as well as from the analysts' consensus.*

*Shareholders are advised that Harmony expects to announce a headline loss per share of between 130 and 160 SA cents per*

*share for the June 2007 quarter, compared with the March 2007 quarter headline profit of 58 SA cents per share.* It is expected that a headline profit of between 20 and 30 SA cents per share will be reported for the 2007 financial year compared with a headline loss of 269 SA cents per share for the 2006 financial year.

*This quarter-on-quarter variance is attributable to a combination of lower production and an increase in costs. Gold production is expected to be down by between 8% and 12%, mainly due to, and as previously disclosed, production incidents at Bambanani and Joel, lower grades mined at Tshepong as well as the underperformance at Mt Magnet's underground operations in Australia.* Progress on rectifying this situation will be reported at the June 2007 results presentation to the investment community.

*The combination of lower production and higher cost will result in the June 2007 quarter's cash cost per kilogram being up by between 35% and 45%. Harmony's total cash operating costs are up by between 25% and 28% quarter-on-quarter. The company ascribes this in part to the newly installed accounting software system that resulted in some of the March quarter's costs being captured in the June 2007 quarter and thus the average of the last six months' cost would be a more accurate reflection of the company's current cost base.*

*During the last six months, the company's cost base increased by between 8% and 12% on the previous six months. The increase in costs is mainly due to consumables (stores) and supervisory labour and detailed plans are being implemented to address the production and cost issues.*

*Shareholders are advised of the resignation of the Chief Executive, Bernard Swanepoel, with immediate effect* and the appointment of Graham Briggs as acting Chief Executive.

\* \* \*

The financial information on which this trading statement is based has not been reviewed nor reported on by the company's auditors. Due to the time taken to install new software and the need to have externally audited numbers available, the announcement of Harmony's quarter and year-end financial results has been postponed to *Monday, 27 August 2007.*  [Emphasis added.]

27.    On this news, the Company's shares fell $2.45 per share, or over 18 percent, to close on August 6, 2007 at $11.02 per share, on unusually heavy trading volume.

28.   Also on August 6, 2007, JP Morgan issued an analyst report about the Company entitled "Harmony Gold Mining Co Ltd Neutral; CEO Bernard Swanepoel resigns suddenly – costs spiral, production slumps. Trouble. – ALERT."  The report, in relevant part, stated:

- Harmony's CEO Bernard Swanepoel has resigned with immediate effect and the group has issued a trading statement guiding earnings for the June quarter significantly lower. ***The group has stated that its March quarter costs had been understated as a result of new accounting system software not capturing costs accurately. After failing to raise $350m by way of a planned corporate bond last month and taking account of the group's revised cash cost guidance*** (cR125,000/kg – before upcoming wage increases) ***we believe that Harmony will struggle to fund its disclosed business plan at the current gold price*** (R152,000/kg).

- Graham Briggs who heads up the group's Australasian operations and projects has been appointed acting CEO. The group has also moved its quarterly reporting date from Monday, 13 August to Monday, 27 August in order to have new accounting system software installed and externally audited numbers available. The trading statement has therefore been based on unaudited numbers.

- According to the statement ***Harmony expects to announce a headline loss per share of between 130cps and 160cps (March: profit of 58cps) as a result of lower production and an increase in costs. Gold production is expected to decline 8–12% due to production incidents at Bambanani and Joel, lower grade at Tshepong and underperformance at Mt Magnet in Australia. This was much worse than the 5% decline in gold production to 517koz we had forecast.***

- ***The group's cash cost guidance is more startling. Total cash operating costs are expected to be up 25–28% qoq*** (from R1.9bn to R2.4bn). The group has stated that part of the problem is a newly installed accounting software system that resulted in some of March quarter's costs being captured in the June quarter. Management has guided that an average of the last six months cost would be a more accurate reflection of the cost base – we estimate this number at cR125,000/kg which is 19% higher than the R104,132/kg reported in the December 2006 quarter. ***Lower production and the higher cost base in the June quarter will see cash costs rise 35–45% to +R145,000/kg as a result.***

- ***The trading statement said that during the last six months the cost base increased 8–12%*** and that this increase was ascribed to the higher costs of consumables, supervisory labour and detailed plans being implemented to address production and costs issues. ***In our view these problems indicate a loss of management control and that the situation could get worse (more staff turnover and spooked creditors) before it MAY improve – we consider forecasting risk unusually high now.***

- ***We believe the group may have to review its business plan as a result of a less certain cash flow outlook than we had forecast*** and a balance sheet (net debt at the end of March 2007 of R1.4bn, assuming the group held 14m shares in Gold Fields and applying today's price of R106/share) that may not be robust enough to support projected capex of R700-800m per quarter.

  * * *

- ***Harmony has lost its architect and CEO in startling fashion. Moreover, it seems likely to us it will be forced to reevaluate its business plan and structure in light of its predicament. The apparent stresses may lead to further management departures in a skills-starved market. The bottom line for us is that forecasting and valuation uncertainty have risen sharply.*** [Emphasis added.]

29.   Additionally, on August 6, 2007, Fitch Ratings placed the Company's long-term issuer default rating of "BB+" and short-term issuer default rating of "B" on Rating Watch Negative ("RWN").  Fitch's announcement, in relevant part, stated:

> The company's National ratings of Long-term 'BBB(zaf)' and Short-term'F3(zaf)' have also been placed on RWN.
>
> Harmony's trading update indicated that it would report a loss of between 130-160 cents per share (equivalent to around ZAR500m-640m), significantly below previous expectations, for Q407 [30 June 2007] due to a combination of lower gold production (reduction of between 8-12%), and a 35-45% increase in cash operating costs. In conjunction with the trading update Harmony also announced the departure of its long-serving CEO, Mr Bernard Swanepoel, and his replacement on an interim basis by Mr Graham Briggs (currently MD of Harmony Australasia).

>Fitch plans to meet with the company's management during the next 1-2 weeks to discuss, among other issues, its plans to address the reported escalation in costs, its future production schedule and possible changes in strategy resulting from the departure of Mr Swanepoel. The agency would expect to resolve the RWN shortly thereafter.

30.     The following day, the Company's shares declined an additional $1.57 per share, or over 14 percent, to close on August 7, 2007 at $9.45 per share, again on heavy trading volume.  This closing price on August 7, 2007 represented a two-day decline in the Company's shares of $4.02 per share, or 29.8 percent, and a cumulative decline of $7.25 per share, or over 43.4 percent, from the value of the Company's shares at their Class Period high of $16.70 on April 25, 2007.

31.     Later on August 7, 2007, *Forbes.com* published an article entitled "Discord at Harmony Mining?"  The article, in relevant part, stated:

>**Harmony Gold Mining has some explaining to do.**
>
>On Tuesday, Harmony Gold's shares slipped 14.3%, or $1.57, to $9.49 at the end of trading, after tumbling 18.1% on Monday, as investors questioned the stability of the South African mining company.
>
>On Monday, the mining company slashed its third quarter forecast and announced the abrupt resignation of Chief Executive Bernard Swanepoel. ***The sudden removal of Swanepoel, who had served the company for 12 years, shocked industry watch dogs.***
>
>***"He was the main man at the company,"*** Barnard Jacobs Mellet[t] analyst Patrick Chidley said Tuesday. ***"The company is left without a clear leadership or a clear direction." In a Monday press release, the company provided little color on the departure, even as it gave a rough snapshot of its production and cost control problems.***
>
>***Harmony said third quarter profits will "differ significantly" from previous quarters because of lower production, and higher overhead, costs. The shortfall will be significant. Harmony now expects a loss per share of 130 to 160 South African cents a share. For comparison, the company earned 58 cents a share in***

*the second quarter. In the third quarter, gold production slipped 8 to 12%, due to production problems at various sites* including its Bamanani, Joel and Tshepong sites in Africa. "Progress on rectifying this situation will be reported at the June 2007 results presentation to the investment community," the company said.

*As production fell, costs have soared. Harmony's cash operating costs balloned 25 to 28% from the previous quarter. Aside from changes in its accounting software system, the company said its cost base rose 8 to 12% in the last six months.* "The increase in costs is mainly due to consumables (stores) and supervisory labour and detailed plans are being implemented to address the production and cost issues," Harmony said.

*"It was worse than we expected," Chidley said. The skimpy press release and the strange departure is not a good sign for the company, which has a market capitalization of $3.8 billion. The massive two-day sell-off "seems to imply that there is something else is going on that we don't know about,"* Chidley said. [Emphasis added.]

32.     Harmony Gold's actual quarter-on-quarter variance, as later reported on August 27, 2007, is illustrated in the following table:

**Financial and Operational Comparison for the March and June 2007 Quarters**

|  |  | March Qtr. | June Qtr. | Change |
|---|---|---|---|---|
| Gold produced | (Kg) | 18,010 | 16,396* | -   9.0% |
| Cash costs | (R/kg) | 103,608 | 149,180 | + 44.0% |
| Cash operating  profit | (Rm) | 869 | 39 | -  95.5% |
| Cash earnings | (SA c/s) | 218 | 10 | -  95.4% |
| Basic profit | (SA c/s) | 62 | - 163 | - 362.9% |
| Headline profit | (SA c/s) | 58 | - 133 | - 329.3% |
| Fully diluted earnings | (SA c/s) | 61 | - 163 | - 367.2% |

*Bambanani and Joel accounted for 1,488 kg., or 92%, of the decline in gold production, and 197 Rm or 24% of the decline in operating profits.

33.     On a dollar basis, cash costs increased from $445 to $655 per ounce, or 47.2 percent.  However, in the preliminary report of August 6, 2007, as set forth in ¶26, *supra*, Harmony Gold explained that:

> ***The combination of lower production and higher cost will result in the June 2007 quarter's cash cost per kilogram being up by between 35% and 45%. Harmony's total cash operating costs are up by between 25% and 28% quarter-on-quarter. The company ascribes this in part to the newly installed accounting software system that resulted in some of the March quarter's costs being captured in the June 2007 quarter and thus the average of the last six months' cost would be a more accurate reflection of the company's current cost base.***
>
> ***During the last six months, the company's cost base increased by between 8% and 12% on the previous six months. The increase in costs is mainly due to consumables (stores) and supervisory labour and detailed plans are being implemented to address the production and cost issues.***  [Emphasis added.]

34.     Further, in the Company's August 6, 2007 Trading Statement, Harmony Gold reported that the drop in gold production in the June 2007 quarter was largely due to an ore blockage problem at Bambanani that resulted in an extended closure of the mine.  However, the Company's August 27, 2007 financial report explained that:

> Tonnages from the SA underground operations were 6.6% down at 2 944 000 tonnes (3 152 000 tonnes) for the quarter under review. The drop in tonnages is attributable to the orepass blockage at Bambanani, the re-engineering of Joel's North Shaft which is expected to be completed end-September and the underperformance at Mt Magnet's underground operations in Australia.
>
> * * *
>
> Volumes from Leverage Operations were down by 246 000 tonnes on the previous quarter as well as lower recovery grade of 4.13g/t. 240 000 tonnes is the direct result of issues at Joel (60 000 tonnes) and Bambanani (180 000 tonnes).
>
> Work at Bambanani commenced mid-July after labour returned to work. Most of the labour had to be re-acclimatised and work areas

required proper risk assessments to address hazards before work could start. This impacted the July month of the September quarter.

Joel had to deal with additional unforeseen difficulties in the June quarter. The two biggest issues are the fact that the shaft ventilation column and cement column had to be removed when it was discovered that they were in extremely poor condition. In an effort to counter the loss of production most crews have been moved to higher mineable grade panels.

35.    The impact of the problems at Bambanani and Joel on Harmony Gold's June 2007 quarter are shown in the following table, which is excerpted from the Company's August 27, 2007 financial report:

**Financial and Operational Comparison for the March and June 2007  Quarters for Harmony's Bambanani and Joel Mines**

|  | Production (kg.) | | Revenue (R 000) | | Costs (R/kg.) | | Profit (R 000) | |
|---|---|---|---|---|---|---|---|---|
|  | Mar. | June | Mar. | June | Mar. | June | Mar. | June |
| Bambanani | 1,870 | 775 | 283,175 | 118,578 | 118,721 | 253,853 | 61,183 | -78,271 |
| Joel | 695 | 302 | 105,852 | 45,787 | 86,236 | 188,532 | 48,645 | -11,211 |

36.    The nature and seriousness of the production problems at Bambanani and Joel warranted the issuing of a Trading Statement when these problems first arose rather than months later after unwary investors purchased the Company's securities on the basis that Harmony's Gold's gold production would meet the production targets for the quarter.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

33.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Harmony Gold's American Depository Receipts ("ADRs" or "shares") and call options, and all those who sold Harmony Gold's put options, between April 2, 2007 and August 7, 2007, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Harmony Gold's ADRs were actively traded on the New York Stock Exchange ("NYSE"), and its options were traded on the Chicago Board Options Exchange ("CBOE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Harmony Gold or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

36.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a) whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and

management of Harmony Gold; and

(c) to what extent the members of the Class have sustained damages and the
proper measure of damages.

38.     A class action is superior to all other available methods for the fair and efficient
adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as
the damages suffered by individual Class members may be relatively small, the expense and
burden of individual litigation make it impossible for members of the Class to individually
redress the wrongs done to them.  There will be no difficulty in the management of this action as
a class action.

## UNDISCLOSED ADVERSE FACTS

39.     The markets for Harmony Gold's ADRs and options were open, well-developed
and efficient at all relevant times.   As a result of these materially false and misleading
statements, and failures to disclose, Harmony Gold's ADRs and call options traded at artificially
inflated prices, and Harmony Gold's put options traded at artificially deflated prices, during the
Class Period.   Plaintiff and other members of the Class purchased or otherwise acquired
Harmony Gold's ADRs and call options, and sold Harmony Gold put options, relying upon the
integrity of the market price of Harmony Gold's ADRs and options, and the market information
relating to Harmony Gold, and have been damaged thereby.

40.     During the Class Period, defendants materially misled the investing public,
thereby inflating the price of Harmony Gold's ADRs and call options, and deflating the price of
Harmony Gold's put options, by publicly issuing false and misleading statements and omitting to
disclose material facts necessary to make defendants' statements, as set forth herein, not false
and misleading.  Said statements and omissions were materially false and misleading in that they

failed to disclose material adverse information and misrepresented the truth about the Company, and its business and operations, as alleged herein.

41.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Harmony Gold's financial well-being and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Harmony Gold and its financial well-being and prospects, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Harmony Gold's ADRs and call options at artificially inflated prices, and selling Harmony Gold put options at artificially deflated prices, thus causing the damages complained of herein.

**LOSS CAUSATION**

42.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

43.     During the Class Period, Plaintiff and the Class purchased Harmony Gold's ADRs and call options at artificially inflated prices, and sold Harmony Gold's put options at artificially deflated prices, and were damaged thereby.  The price of Harmony Gold's ADRs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**Applicability of Presumption of Reliance:**
<u>**Fraud On The Market Doctrine**</u>

44.     At all relevant times, the market for Harmony Gold's ADRs and options was an efficient market for the following reasons, among others:

(a) Harmony Gold's ADRs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) Harmony Gold's options met the requirements for listing, and were listed and traded on the CBOE, a highly efficient and automated market;

(c) As a regulated issuer, Harmony Gold filed periodic public reports with the SEC and the NYSE;

(d) Harmony Gold regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e) Harmony Gold was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

45.     As a result of the foregoing, the market for Harmony Gold's ADRs promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the price of Harmony Gold's ADRs, and all purchasers of Harmony Gold's ADRs and call options, and all sellers of Harmony Gold's put options, during the Class Period, suffered similar injury through their transactions, and a presumption of reliance applies.

## NO SAFE HARBOR

46.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Harmony Gold who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

47.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.    During the Class Period, defendants made false statements, and omitted disclosure of material adverse information that was intended to, and throughout the Class Period, did: (i) deceive the investing public; and (ii) cause them to purchase Harmony Gold's ADRs and call options at artificially inflated prices, and to sell Harmony Gold put options at artificially deflated prices.

49.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

50.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Harmony Gold's financial well-being and prospects from the investing public and supporting the artificial prices of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

51.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Harmony Gold's ADRs and call options was artificially inflated, and the market price of Harmony Gold put options was artificially deflated, during the Class Period.

52.     In ignorance of the fact that market prices of Harmony Gold's ADRs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the shares trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Harmony Gold's ADRs and call options at artificially high prices, and sold Harmony Gold put options at artificially deflated prices, during the Class Period and were damaged thereby.

53.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems with cost accounting and mining operations that Harmony Gold was experiencing, which were not disclosed by the Company, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Harmony Gold ADRs and call options, or if they had acquired such shares during the Class Period, they would not have done so at artificially inflated prices, and would not have sold their Harmony Gold put options, or if they had sold such put options during the Class Period, would not have done so at artificially deflated prices.

54.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Harmony Gold, their control over, and/or receipt and/or modification of Harmony Gold's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Harmony Gold, knew of or recklessly disregarded the falsity of their Class Period statements alleged herein.

55.     Additionally, during the Class Period, the defendants utilized the Company's false and misleading financial and operational condition in an effort to launch a $350 million corporate bond offering in July 2007.

56.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADRs and options during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of
The Exchange Act Against the Individual Defendants**

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of Harmony Gold within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-

level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including, for example, the decision not to disclose the production problems at Bambanani and Joel.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the cost accounting methodology and assumptions giving rise to the securities violations as alleged herein, and exercised the same.

61.    As set forth above, Harmony Gold and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Harmony Gold's ADRs and call options, and their sale Harmony Gold's put options, during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the

Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 16, 2008                     **BRODSKY & SMITH, LLC**

By:*s/ Evan J. Smith, Esquire*
Evan J. Smith, Esquire
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (facsimile)


**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
Richard A. Maniskas
D. Seamus Kaskela
David M. Promisloff
280 King of Prussia Rd.
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

**Attorneys for Plaintiff**